UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KALDOON HADDAD, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 3942 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| MIDLAND FUNDING, LLC and MIDLAND CREDIT MANAGEMENT, INC., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Kaldoon Haddad sued Midland Funding, LLC and Midland Credit Management, Inc. (together, "Midland") for violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. Doc. 15. Midland answered the complaint, Doc. 22, and now moves to dismiss the suit for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, alternatively, for judgment on the pleadings under Rule 12(c). Doc. 23. The motion is denied.

**Background**

As on a Rule 12(b)(6) motion, the court on a Rule 12(b)(1) motion submitted on the pleadings or on a Rule 12(c) motion assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016); *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014); *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 539 (7th Cir. 2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Haddad's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017,

1

1020 (7th Cir. 2013). The facts are set forth as favorably to Haddad as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Haddad incurred debt on a Citibank credit card account and then failed to pay it off. Doc. 15 at ¶¶ 11-12. Citibank (not a party here) eventually closed the account, ceased charging interest and late fees, and sold the debt to Midland Funding. *Id*. at ¶¶ 13-17. Midland Funding in turn assigned the debt to its subsidiary, Midland Credit Management ("MCM"), for collection. *Id*. at ¶ 18.

In May 2015, MCM sent Haddad a collection letter. *Id*. at ¶ 19. The letter identified Midland Funding as the debt's owner, Citibank as the original creditor, and an outstanding balance of $1,823.84. *Id*. at ¶ 20; Doc. 15-1 at 10. The letter advised Haddad that MCM was "considering forwarding this account to an attorney … for possible litigation," and asked that he call to discuss possible "discounts and affordable payment plans" and/or mail it $250 in order "to stop this process from continuing." Doc. 15-1 at 10. The letter then asserted: "If this account goes to an attorney, our flexible options may no longer be available to you." Doc. 15 at ¶ 22; Doc. 15-1 at 10. MCM, however, routinely continues to offer flexible payment options for accounts that have been forwarded to attorneys, even after lawsuits have been filed, and it never intended to make flexible payment options unavailable to Haddad. Doc. 15 at ¶¶ 24-26.

About two months later, in July 2015, MCM sent Haddad another letter. *Id*. at ¶ 29. That letter, too, identified Midland Funding as the debt's owner and Citibank as the original creditor. *Id*. at ¶ 30; Doc. 15-1 at 13. The letter began, "The purpose of this letter is to inform you that

your account has been transferred to the internal legal collections department at [MCM] for possible initiation of legal proceedings against you." Doc. 15-1 at 13. It continued:

> As of the date of this letter, you owe $1,823.84 on the above-referenced account. This may include other charges that apply to this account. *In addition, charges may continue to accrue on some or all of the balance due until the account is satisfied.* Thus, the amount due on the day you pay may be greater than the amount above. Please contact us to obtain an exact payoff amount or for further information.

Doc. 15 at ¶ 33; Doc. 15-1 at 13 (emphasis added). Midland, however, lacked authority to add any additional charges to Haddad's account, and it has not done so since Citibank closed the account. Doc. 15 at ¶¶ 34-35.

## Discussion

### I. Rule 12(b)(1) Motion

Midland's motion to dismiss for lack of subject matter jurisdiction turns not on whether Haddad has alleged a violation of the FDCPA—as explained below, he has—but on whether Article III of the Constitution permits this court to do anything about it. The issue is whether Haddad has standing to bring this suit. Doc. 23 at 3-7. The "irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation and internal quotation marks omitted). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (internal quotation marks omitted).

Here, whatever injury Haddad suffered was caused by MCM's sending the collection letters, and a favorable judicial decision could redress Haddad's injury through an award of

statutory damages under the FDCPA. *See* 15 U.S.C. § 1692k(a)(2)(A). And because the letters were sent specifically to Haddad, his injury was "particularized"—the letters "affect[ed] [him] in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. So the decisive question here is whether Haddad has alleged an injury that is also concrete. *See id*. at 1550 (holding that failure to separately analyze concreteness and particularity was error)

To be concrete, a plaintiff's injury "must be *de facto*; that is, it must actually exist." *Id*. at 1548 (internal quotation marks omitted). In other words, the injury must be "real," as opposed to "abstract." *Ibid*. Both "tangible" and "intangible" injuries, even those that are "difficult to prove or to measure," can suffice. *Id*. at 1549. But concreteness requires at least some "appreciable risk of harm" to the plaintiff. *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016); *see also Spokeo*, 136 S. Ct. at 1550 (holding that there is no standing where the complained-of conduct does not "cause harm or present any material risk of harm"); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 911 (7th Cir. 2017) (holding that the plaintiff lacked standing where he identified no "plausible (even if attenuated) risk of harm to himself"). Injuries that are too ethereal to meet this standard include: "the dissemination of an incorrect zip code" to the general public, *Spokeo*, 136 S. Ct. at 1550; printing a customer's untruncated credit card expiration date on a receipt that only the customer saw, *see Meyers*, 843 F.3d at 727; and a company's retention of a former customer's personal information, absent any allegation that the data was disseminated or exposed to theft, *see Gubala*, 846 F.3d at 910.

When attempting to identify valid injuries in fact, Congress's judgment is an "instructive and important" source of guidance. *Spokeo*, 136 S. Ct. at 1549. Congress is "well positioned to identify intangible harms that meet minimum Article III requirements" and, through legislation, may "define" and thus render "legally cognizable" injuries that were once obscure. *Ibid*.; *see*

4

*also Massachusetts v. EPA*, 549 v. 497, 516 (2007) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 580 (1992) (Kennedy, J., concurring in part and concurring in the judgment) (same). Nevertheless, *Spokeo* cautions that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 136 S. Ct. at 1549 (internal quotation marks omitted). So although courts must give due deference to Congress's judgment, they also must remain vigilant to distinguish statutory injuries that "actually exist" from "bare procedural violation[s]" of a statute and other products of the legislative imagination that are "divorced from any concrete harm." *Ibid*.

Another useful guide for spotting concrete injuries is "historical practice"—*i.e.*, "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Ibid*. In *Spokeo*, for example, the Supreme Court noted that "the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure," citing the Restatement (First) of Torts §§ 569 (libel) and 570 (slander *per se*) to illustrate the point. *Ibid*. The Court's remand to the Ninth Circuit then left open the possibility that the plaintiff might have suffered a concrete injury where inaccurate—but non-libelous—biographical information about him was offered to the general public. *See id*. at 1546, 1550. Similarly, the Ninth Circuit has held post-*Spokeo* that a plaintiff who receives unwanted telemarketing text messages in violation of Telephone Consumer Protection Act, 47 U.S.C. § 227, suffers a concrete harm because "[a]ctions to remedy defendant's invasion of privacy, intrusion upon seclusion, and nuisance have long been heard by

5

American courts." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).

Under these principles, Haddad has alleged a concrete injury. Congress enacted the FDCPA to rein in certain "evils associated with debt collection," *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015), because existing legal remedies were, in its judgment, "inadequate to protect consumers," 15 U.S.C. § 1692(b). Those "abusive debt collection practices" included "false representations as to a debt's character, amount, or legal status." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 577 (2010). To address those practices, the FDCPA imposes a "rule against trickery." *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 473 (7th Cir. 2007); *see also O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 941 (7th Cir. 2011) (noting that the FDCPA's prohibitions "keep consumers from being intimidated or tricked by debt collectors"). The statute thus gives debtors a right to receive accurate information, which they can enforce against debt collectors by bringing suit under the FDCPA. *See Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757 (7th Cir. 2009) ("The [FDCPA] is designed to provide information that helps consumers to choose intelligently … .").

The value of receiving truthful information about one's financial affairs—and the ill effects of receiving misleading information—may be hard to quantify, especially where, as here, the plaintiff did not act upon the misinformation. But being lied to in violation of an anti-trickery statute like the FDCPA is a concrete harm nevertheless. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding that a plaintiff "who has been the object of a misrepresentation made unlawful" by federal statute suffered an injury in fact and thus had Article III standing). The harm of being affirmatively misled also has the sort of longstanding

6

historical pedigree described in *Spokeo*, which put Congress on firm footing when it created a right to redress in the FDCPA. *See*, *e.g.*, Restatement (First) of Torts § 525 (1938) (liability for fraudulent misrepresentations).

*Havens Realty* illustrates the point. That case concerned the standing of "testers" to bring suit against a landlord for racial discrimination under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, despite the fact that they merely "pose[d] as renters or purchasers for the purpose of collecting evidence." 455 U.S. at 373. The defendant allegedly told white testers that it had apartments available, but lied to a minority tester who made similar inquiries on the same days. *Id*. at 368. The Supreme Court held that the minority tester had alleged an Article III injury in fact. *Id*. at 374. Significantly for present purposes, the Court reasoned that the Fair Housing Act's prohibition on "'represent[ing] to any person because of race … that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available' … conferred on all 'persons' a legal right to truthful information about available housing." *Id*. at 373 (emphasis omitted) (quoting 42 U.S.C. § 3604(d)). The Court explained that any deprivation of that right caused a direct and personal injury sufficient to confer standing, even absent any allegation of pecuniary harm. *See id*. at 374 ("That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury … ."). This holding from *Havens Realty* is consistent with *Spokeo*, *see Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring) (citing *Havens Realty*), and, in any event, would remain binding on this court even if there were tension between the two. *See Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *In re Horizon Healthcare Servs. Inc. Data*

*Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017) (declining to interpret *Spokeo* expansively where doing do would conflict with prior precedents, because "we do not assume that the Supreme Court alters the law unless it says so").

Midland argues that *Havens Realty* is distinguishable because the misinformation there had a racially discriminatory motivation and thus "potentially injure[d] a person's being in ways that we can never truly know." Doc. 30 at 5. But *Havens Realty* turns only on the misleading nature of the representations, not on the racial motivation behind them. *See Havens Realty*, 455 U.S. at 374 (characterizing the relevant harm as "injury to [the plaintiff]'s statutorily created right to truthful housing information"); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1527 (7th Cir. 1990) (describing the holding of *Havens Realty* as "Congress can create new substantive rights, such as the right to be free from misrepresentations, and if that right is invaded the holder of the right can sue without running afoul of Article III, even if he incurs no other injury"). Like the realtor in *Havens Realty*, Haddad alleges the violation of his right to receive truthful information. That is enough to cause a concrete injury. *See Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 72 (N.D. Ill. 2016) (holding, post-*Spokeo*, that "the type of injury alleged here, receiving a debt collection letter that, it is alleged, wrongly assess percentage-based collection costs, is concrete"). If anything, Haddad's harm is *more* concrete than the harm in *Havens Realty*. Truthful information about the state of Haddad's financial affairs had intrinsic value to him, in a way that truthful information about housing vacancies did not for testers who did not actually need housing.

Haddad and debtors like him benefit concretely from the FDCPA's demand that their debt collectors' representations concerning the status and potential future consequences of their unpaid debts will be honest. Haddad's claim that Midland deprived him of that right alleges a

concrete harm. *See Havens Realty*, 455 U.S. at 374. Haddad therefore may enforce in federal court his FDCPA-protected right not to receive misinformation, whether or not he alleges that he took any particular action in reliance upon that misinformation. *See ibid*.

Midland offers no sound reason to reach the contrary result. Much of its briefing focuses on classifying Haddad's FDCPA rights as "procedural" rather than "substantive," or on establishing that substantive rights conferred by Congress are not inherently concrete after *Spokeo*. Doc. 30 at 2-3, 8; Doc. 45 at 3; Doc. 51 at 2-4. Midland is correct that the concreteness analysis does not turn on the "substantive" or "procedural" nature of the right. *See Gubala*, 846 F.3d at 912 ("[A] failure to comply with a statutory requirement to destroy information is substantive, yet need not … cause a concrete injury."); *Meyers*, 843 F.3d at 727 n.2 ("[W]hether the right is characterized as 'substantive' or 'procedural,' its violation must be accompanied by an injury-in-fact."). But whether deprivation of a substantive right created by Congress *necessarily* gives rise to Article III standing is neither here nor there; the question is whether a violation of the right at issue here—however characterized—occasions a concrete harm. For the reasons already given, the answer is yes.

The precedents cited by Midland do not say otherwise. In *Meyers v. Nicolet Restaurant of De Pere*, *supra*, the Seventh Circuit held that the plaintiff had no standing to sue a retailer who violated a provision of the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. § 1681c(g)(1), by failing to truncate his credit card's expiration date on his receipt. 843 F.3d at 725-26. The court reasoned that although FACTA was aimed at curbing identity theft, the plaintiff "discovered the violation immediately and nobody else ever saw the non-compliant receipt," meaning that the violation did not expose him to any appreciable risk of having his identity stolen. *Id*. at 727. The court also relied in part on findings in the Credit Card Receipt

9

Clarification Act of 2007, which "declared that failure to truncate a card's expiration date, without more, does not heighten the risk of identity theft" and "sought to limit FACTA lawsuits to consumers 'suffering from actual harm.'" *Id*. at 727-28 (quoting Pub. L. 110-241, § 2(a)(6)). So the FACTA violation in *Meyers* was tangential to the ills Congress legislated against and at odds with its express judgment about the propriety of such suits. By contrast, MCM's sending misinformation to Haddad directly implicated the concerns that motivated Congress to enact the FDCPA.

*Gubala v. Time Warner Cable*, *supra*, is also distinguishable. The plaintiff in *Gubala* accused the defendant cable company of retaining his social security number, credit card information, and other personal information long after he ceased being a customer. 846 F.3d at 910. The plaintiff claimed that this data retention violated a provision of the Cable Communications Policy Act requiring cable operators to "destroy personally identifiable information if the information is no longer necessary." *Ibid*. (quoting 47 U.S.C. § 551(e)). The plaintiff did not, however, allege that the cable company otherwise mishandled his data or exposed it to theft, meaning that he "failed to show … even a remote probability that [the defendant]'s rather puzzling conduct is harmful to him," which meant that he did not suffer a concrete injury. *Id*. at 912.

In *Gubala*, the plaintiff's need to allege a specific theory of harm arose because the cable company's conduct was fundamentally "self-regarding"—by "cluttering up its files with old subscription information," the cable company was harming only itself. *Ibid*. Absent some allegation that its "self-destructive" conduct also affected the plaintiff, the Seventh Circuit explained, the company's records management practices were "its business"—not the plaintiff's, and so not the court's, either. *Ibid*. Here, by contrast, Midland is alleged to have personally

10

misled Haddad, which *is* his business. *See Havens Realty*, 455 U.S. at 375 ("[T]he injury underlying tester standing—the denial of the tester's own statutory right to truthful housing information caused by misrepresentations to the tester—is a direct one.").

Similarly distinguishable is *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511 (D.C. Cir. 2016), which also concerned an allegation of consequence-free data hoarding, making it no more helpful to Midland than *Gubala*. *See id.* at 514-15 (holding that the plaintiffs' "naked assertion that a zip code was requested and recorded without any concrete consequence" did not establish standing). The other authorities cited by Midland are either distinguishable or, to the extent that any of them concerned materially similar allegations, unpersuasive for the reasons already stated. *See*, *e.g.*, *Johnston v. Midland Credit Mgmt.*, 2017 WL 370929, at *2-4 (W.D. Mich. Jan. 26, 2017) (holding that the plaintiff lacked standing to challenge a false statement under § 1692e, without discussing *Havens Realty* or its progeny, where the misstatement in question was favorable to him); *Jackson v. Abendroth & Russell, P.C.*, 207 F. Supp. 3d 945, 961 (S.D. Iowa 2016) (holding that the plaintiff lacked standing to allege a violation of § 1692g's disclosure requirements, while "recogniz[ing] that violations of other FDCPA provisions [including § 1692e] may be sufficient on their own to constitute an Article III injury in fact").

Only one other decision merits further discussion. In its briefs, Midland cited *Lyshe v. Levy*, No. 16-cv-516 (S.D. Ohio Aug. 22, 2016) (reproduced at Doc. 30 at 18-24), as an example of a case dismissing a § 1692e suit for lack of standing post-*Spokeo*. Two weeks ago, the Sixth Circuit affirmed. *See Lyshe v. Levy*, __ F.3d __, 2017 WL 1404182 (6th Cir. Apr. 20, 2017). The supposed FDCPA violation in *Lyshe* arose when the defendants, while attempting to collect the plaintiff's debt in state court, "made misstatements in their discovery requests about state procedural rules," *id.* at *3; specifically, they told him that his responses to their requests for

11

admission needed to be sworn and notarized, when in fact they did not, *id*. at *1. The defendants also allegedly failed to serve their discovery requests in an electronic format, although they offered to do so upon request. *Ibid*. The Sixth Circuit held that those alleged violations did not occasion a concrete harm, reasoning that "the procedural violation alleged here—a violation of state law procedure not required under FDPCA," at most in theory could have caused the plaintiff to "visit a notary and contact Appellees to obtain electronic copies of the discovery," which "was not the type of harm the FDCPA was designed to prevent." *Id*. at *3. *Lyshe* is distinguishable precisely on that basis, as the harm Haddad alleges, being misled by a debt collector, *is* the type of harm that the FDCPA was designed to prevent. Indeed, *Lyshe* made clear that it was not a case where "defendants intentionally misrepresented facts concerning the plaintiff's debt that they knew to be false," and the Sixth Circuit in fact distinguished a prior decision addressed to that situation as one in which "the harm … arose from the abusive debt collection practices that the FDCPA was designed to prevent." *Id*. at *5.

In sum, the judgment of Congress, the guidance of history, and *Havens Realty* compel the conclusion that the harm of receiving misleading information in violation a statutory right to truthful information is concrete. Haddad has alleged such a harm, and so he has standing to bring this FDCPA suit.

**II.** **Rule 12(c) Motion**

Midland's motion for judgment on pleadings argues that Haddad has failed to allege conduct that violates the FDCPA and that, even if violations did occur, Midland Funding cannot be held liable for them. Doc. 23 at 7-13.

As noted, Congress enacted the FDCPA to eliminate abusive debt collection practices. *See Jerman*, 559 U.S. at 577; *Bentrud*, 794 F.3d at 874. Section 1692e prohibits a debt collector

12

from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e; *see Ruth v. Triumph P'ships*, 577 F.3d 790, 799 (7th Cir. 2009). That "rule against trickery," *Beler*, 480 F.3d at 473, sets forth "a nonexclusive list of prohibited practices" in sixteen subsections, *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1019 (7th Cir. 2014). Although a plaintiff "need not allege a violation of a specific subsection in order to succeed in a § 1692e case," *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012), Haddad cites subsections (2)(A), (5), and (10), which proscribe, respectively, "[t]he false representation of … the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken," *id.* § 1692e(5); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," *id.* § 1692e(10). Haddad also alleges that Midland violated 15 U.S.C. § 1692f, which prohibits debt collectors from employing "unfair or unconscionable means to collect or attempt to collect any debt."

The Seventh Circuit "has consistently held that with regard to 'false, deceptive, or misleading representations' in violation of § 1692e of the FDCPA, the standard is … whether the debt collector's communication would deceive or mislead an unsophisticated, but reasonable, consumer if the consumer is not represented by counsel." *Bravo v. Midland Credit Mgmt., Inc.*, 812 F.3d 599, 603 (7th Cir. 2016); *see also Gruber v. Creditors' Prot. Serv., Inc.*, 742 F.3d 271, 273 (7th Cir. 2014) (noting that FDCPA claims "are evaluated under the objective 'unsophisticated consumer' standard"). That standard protects a consumer who "may be uninformed, naïve, or trusting," but who nonetheless "possess[es] rudimentary knowledge about the financial world." *Gruber*, 742 F.3d at 273 (internal quotation marks omitted). Although

13

unsophisticated, the reasonable consumer is "not a dimwit" and "is capable of making basic logical deductions and inferences." *Lox*, 689 F.3d at 822 (internal quotation marks omitted).

### A. The July 2015 Letter

Haddad takes issue with MCM's statement in its July 2015 letter that "charges may continue to accrue on some or all of the balance due until the account is satisfied." Doc. 15-1 at 13. This, he contends, was a threat and a falsehood because Midland lacked any authority to charge him interest. In response, Midland argues that the statement was truthful and thus not misleading, but it does not contend that it could have or would have added interest or other similar fees to the closed-out account balance. Doc. 23 at 9-10. Instead, Midland submits that the letter's assertion that "charges may continue to accrue on some or all of the balance" referred to "post-judgment interest and costs" that a *court* might award in the wake of a lawsuit to collect the debt. *Id.* at 9.

Only a lawyer could love that interpretation, and no reasonable debtor—much less an unsophisticated one—would arrive at such a tortured reading on his own. For one thing, the word "charges" connotes fees added to the account by the creditor; it is not a term often associated with court awards. Moreover, the letter said that "charges may *continue* to accrue," not that charges "can" or "will" accrue at some future date. Doc. 15-1 at 13 (emphasis added). A reasonable debtor could and almost certainly would conclude from the word "continue" that "charges" *already* had been added, and therefore almost certainly would not surmise that "charges" meant potential future awards of litigation costs and post-judgment interest. Finally, the letter said that charges would "accrue on some or all of the balance." Doc. 15-1 at 13. In common parlance, interest accrues "on" a "balance"; court awards do not. So, taken as a whole, MCM's statement was highly likely leave an unsophisticated debtor with the inaccurate

impression that the amount of the underlying debt itself would—or at least might—continue to increase if he delayed payment, and that suffices to state a claim. *See Gruber*, 742 F.3d at 273 (noting that the unsophisticated consumer "tend[s] to read collection letters literally" and "does not interpret them in a bizarre or idiosyncratic fashion"); *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 778 (7th Cir. 2007) ("[A] threat to impose a penalty that the threatener knows is improper because unlawful is a good candidate for a violation of [the FDCPA]."); *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 455 (3d Cir. 2006) ("A debt collection letter is deceptive where it can be reasonably read to have two or more different meanings, one of which is inaccurate.") (internal quotation marks omitted).

The cases cited by Midland, *Taylor v. Cavalry Investments, L.L.C.*, 365 F.3d 572 (7th Cir. 2004), and *Williams v. OSI Education Services, Inc.*, 505 F.3d 675 (7th Cir. 2007), are distinguishable. In *Taylor*, the Seventh Circuit affirmed a defense summary judgment where the debt collector told the plaintiffs that "your account may have or will accrue interest." 365 F.3d at 574. That statement was accurate because, although the creditors had in practice stopped adding interest to two of the three plaintiffs' accounts, "presumably they could have continued doing so until the debts were paid." *Ibid*. Under those circumstances, the statement was not false, since "[t]he letter didn't say they would, only that they might." *Id*. at 575. In *Williams*, the same was true: the letter stated that the listed balance "may not reflect the exact amount of interest which is accruing daily," and that assertion was not confusing because the "common sense reading of the letter"—that "the amount due will increase because of interest that is accruing daily"—was accurate. 505 F.3d at 679. Here, by contrast, Haddad alleges that Midland had no authority to add further charges to his account. Doc. 15 at ¶ 34. In addition, *Williams* concerned only the distinct requirement in 15 U.S.C. § 1692g(a)(1) that dunning letters must

15

"state the amount of the debt clearly enough that the recipient is likely to understand it"; it did not interpret § 1692e's prohibition on general trickery. *Id*. at 677 (internal quotation marks omitted).

This case is much closer to *Gonzales v. Arrow Financial Services, LLC*, 660 F.3d 1055 (9th Cir. 2011), where the debt collector's statements—"if we are reporting the account, the appropriate credit bureaus will be notified that this account has been settled," and "a negative credit report reflecting on your credit record may be submitted to a credit reporting agency"— were held to be misleading under the FDCPA. *Id*. at 1059-60, 1063. As the court explained, because there was "no circumstance under which [the debt collector] could legally report an obsolete debt to a credit bureau, the implication that [the debt collector] could make a positive report in the event of payment [was] misleading." *Id*. at 1063. The implication here that Midland had the ability to charge interest was similarly misleading if, as Haddad alleges, it had no such ability. Haddad has stated a claim based on the July 2015 letter.

B. **The May 2015 Letter**

Haddad also takes issue with the assertion in MCM's May 2015 letter that "[i]f this account goes to an attorney, our flexible options may no longer be available to you." In Haddad's view, this statement "threatened an action that [MCM] did not intend to take" in violation of § 1692e(5) because MCM never intended to make flexible payment options unavailable. Doc. 15 at ¶ 54; Doc. 29 at 10. Midland counters only that the statement was not a threat because it "does not declare an intention to take such action, or suggest that the decision regarding the elimination of flexible payment options was either imminent or had already been made." Doc. 23 at 11.

Section 1692e(5) prohibits debt collectors from threatening "to take any action … that is not intended to be taken," and Haddad has alleged that making flexible options unavailable was that sort of action. Doc. 15 at ¶¶ 24-26. A threat "involves a declaration of an intention to take some action." *St. John v. Cach, LLC*, 822 F.3d 388, 390-91 (7th Cir. 2016). Midland argues that the statement that it "may" stop offering flexible options does not reflect any intention to do so. But for purposes of § 1692e(5), a threat can be stated in noncommittal terms and still run afoul of the FDCPA. *See Ruth*, 577 F.3d at 799-802 (holding that the statement that "we *may* collect and/or share all the information we obtain in servicing your account" was a threat under § 1692e(5), where the defendant could not legally share the plaintiff's personal information) (emphasis added); *Gonzales*, 660 F.3d at 1062, 1064 (holding that the statement that a "negative credit report reflecting on your credit record *may* be submitted to a credit reporting agency" was a threat under § 1692e(5), where the defendant did not intend to make reports to a credit bureau and was legally prohibited from doing so). This is in keeping with the principle that, under the FDCPA, "a threat need not be express: it can be implied." *Gonzales*, 660 F.3d at 1064. Haddad has identified a "threat" within the meaning of § 1692e(5), so the claim based on the May 2015 letter can proceed.

C.  **Midland Funding's Liability**

The parties dispute whether Midland Funding is a proper defendant, given that only MCM sent the May 2015 and July 2015 letters. Doc. 23 at 12-13. The parties' disagreement may arise, at least partly, from a misunderstanding. Midland's reply brief concedes that, under Seventh Circuit precedent, Midland Funding could potentially be held *vicariously* liable for the actions that MCM took on its behalf, while disputing what Midland understood to be Haddad's position that Midland Funding could be held *directly* liable. Doc. 30 at 14. At a hearing,

however, Haddad's counsel clarified that Haddad seeks to hold Midland Funding liable only vicariously:

> THE COURT: … Let me ask the plaintiff, are you bringing a direct liability claim against Midland or a vicarious liability claim?
>
> PLAINTIFF'S COUNSEL: We're bringing a vicarious liability claim, your Honor.

So both sides in fact agree that an entity fitting the definition of a debt collector can be held vicariously liable under the FDCPA for the debt-collecting actions of an agent. Doc. 29 at 15; Doc. 30 at 14. That understanding of the law is correct. *See Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325-26 (7th Cir. 2016); *Pollice v. Nat'l Tax Funding, LP*, 225 F.3d 379, 404-05 (3d Cir. 2000).

The only question, then, is whether Midland Funding fits the statutory definition of a "debt collector." For purposes of the FDCPA:

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). Haddad alleges that Midland Funding "is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others," is licensed as a collection agency by the State of Illinois, and "regularly collects or attempts to collect defaulted consumer debts." Doc. 15 at ¶¶ 5-7. That fits the definition.

Two points merit discussion. First, the fact that Midland Funding owns the debt does not, by itself, place it outside the statutory definition, even though the definition requires that the debts in question must be "owed or due another." Seventh Circuit precedent holds that an entity like Midland Funding that purchased a debt from the loan's originator can fit the statutory definition, so long as it acquired the debt when the debt was in default. *See Ruth*, 577 F.3d at

796 ("Where, as here, the party seeking to collect a debt did not originate it but instead acquired it from another party, we have held that the party's status under the FDCPA turns on whether the debt was in default at the time it was acquired."); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 501 (7th Cir. 2008) ("[T]he purchaser of a debt in default is a debt collector for purposes of the FDCPA even though it owns the debt and is collecting for itself."); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 538-39 (7th Cir. 2003). The issue of whether such "debt buyers" fit the statutory definition of "debt collector" is pending before the Supreme Court in *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 810 (2017), which was argued on April 18, 2017. But unless and until the Supreme Court holds otherwise, this court is bound to follow circuit precedent. *See Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 495 (7th Cir. 1997) (en banc). Because Haddad alleges that his debt was in default when Midland Funding acquired it, Doc. 15 at ¶¶ 12, 17, Midland Funding's status as the debt's current owner does not place it outside the FDCPA's scope.

Second, Midland argues that Midland Funding cannot be a "debt collector" because it did not actually send the May 2015 and July 2015 letters. Doc. 23 at 12; Doc. 30 at 13. But that contention cannot be squared with *Janetos*, which held one company liable for letters that another company "drafted and sent," reasoning that "[a] debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself." 825 F.3d at 325. Midland's argument also is at odds with the statutory text, which contemplates "indirect" debt collection and focuses on the entity's habitual behavior, not necessarily its conduct in the specific case at hand. *See* 15 U.S.C. § 1692a(6) (defining "debt collector," in part, as one "who regularly collects or attempts to collect, directly or indirectly, debts"). Because Haddad alleges that Midland Funding itself

19

regularly engages in debt collection activities and that MCM was acting as its agent, his claims against Midland Funding may proceed.

**Conclusion**

For the foregoing reasons, Midland's motion to dismiss for lack of subject matter jurisdiction or for judgment on the pleadings is denied.

May 1, 2017

_____
United States District Judge